Good morning. I'd like to reserve three minutes, if I may, for the meeting. This appeal arises out of two competing provisions of an ERISA plan. The first is a coordination of benefits, which is the provision of the plan on which Citizens is relying. The second one is the reimbursement subrogation provision. The Trump court basically ruled in this case that he had to give effect to the coordination of benefits provision. He ruled that accepting our argument that the reimbursement or subrogation provision did in fact apply in this situation would negate the coordination of benefits provision. That was the substance of his ruling on this point. The first issue that I've raised in the brief is, in light of the case law that exists in this circuit and obviously elsewhere with respect to giving plan language a harmonious reading, there is an obvious way in which these two provisions can in fact be harmoniously construed. There is no question that the coordination of benefits provision does in fact talk about who pays first. It's difficult for me to contest the fact that once the primary payor is identified in the plan documents as somebody who has an employment relationship, it's difficult to suggest that there is in fact a primary payor status to be attributed to citizens. However, there is no conflict that would exist if they do in fact pay first but yet give effect to the reimbursement or subrogations of the plan. The simple fact is that the two provisions do in fact work together. There is little doubt that when the plan administrators prepared that particular provision of the plan, that they intended for this type of reimbursement to be exercised and they even specifically gave themselves the discretion to construe the language of that particular provision. So the simple fact is that I believe the trial court's primary error in this case was saying that he had to give effect to the coordination of benefits provision because to do otherwise would negate that provision. And I cited the court to the Prater case from this circuit which rather wisely observed that there are situations in which applying this non-nugatory standard of examining a plan language could actually render another provision of the plan to be nugatory. And that is I think precisely what we have here. We have a situation where the trial court says I can't accept the plaintiff's argument because it would render the coordination of benefits provision. However, by doing so, he has in fact negated the clear language of the reimbursement provision. The obvious difficulty that this plan language presents is that both the coordination of benefits provision and the reimbursement provision that I am talking about here, both of them refer directly to no-fault benefits. In other words, there is no question in this situation that the coordination of benefits provision explicitly covers no-fault benefits. However, the same is true with respect to the provision that we are relying on, the reimbursement provision. It specifically identifies... But why do you... Wouldn't you also be giving it effect if you said that it applies when the plan has paid but someone else should be primary? I'm not quite sure exactly what you mean. Well, let's say you have a situation where under the plan, citizens was primary. Citizens was refusing to pay, so there was confusion in the beginning. They didn't really know. So they made their payments, and then they would be able to go under the reimbursement and subrogation for reimbursement of the amount that they should not have paid. Yes. So why are you rendering that clause without meaning if you also enforce the coordination of benefits? Because it does in fact... My point is it refers precisely to no-fault benefits, and it puts no-fault benefits in that portion of the provision which says we can get reimbursement from no-fault benefits that are paid or payable, that are paid or may be paid. Now, the point is that it would cover this situation. Whether there are other situations which it might cover, I don't quite know, but the fact is it does pertain to this situation. And there's another very important point that I want to stress here, and that is the suggestion that this accepting our interpretation of the reimbursement plan sort of renders the entire coordination of benefits provision to be negatory is about $440,000 wrong. The simple fact is that under the facts of this case, Arvin Mirador, the plan, has arrangements with various providers. Under those arrangements, they have a reduced amount that they have to pay. So the fact is that there is an exhibit which I have mentioned in the reply brief. There is an exhibit which dramatically demonstrates that the amount of money which actually was billed by providers was in the neighborhood of almost $1 million or something close to that, or $900,000. But the simple fact is that Arvin Mirador, because of these arrangements with providers, paid a fraction of that, I believe about $490,000. Now, the way the plan is set up is that the reimbursement provision is only to the amount that Arvin Mirador paid, which means that this clause is of tremendous significance when you put these two provisions together, two citizens. And the reason for it is quite simple. Citizens does not have its obligations under Michigan's No-Fault Act. And those obligations consist of paying providers, in essence, on the nose, if you will. Instead, their obligation under the reimbursement provision is to only pay up to that which Arvin Mirador paid. And in that respect, this is not meaningless. It doesn't render this particular provision meaningless. The simple fact is that citizens reduces its obligation in the circumstances because of Arvin Mirador paying first by a total of about $440,000. Now, this is not what the trial court ruled. The trial court ruled that this would, in interpretation, give an effect to the reimbursement provision. Does it matter that the first clause of that provision refers to segregation and then the second clause that is referring to the plan recipient adds the reimbursement? They're obviously both covered, as Mr. Saylor has pointed out and this court has found. They are two different concepts. Subrogation is standing in the shoes of somebody, but reimbursement must mean something different. And your question is with respect to the first provision? Well, the first paragraph refers to segregation and it talks about segregation to rights. The second paragraph says in addition to any segregation rights, we shall also have an independent right to be reimbursed by you. Yes. So I'm asking if it matters that the first clause refers to segregation. The second paragraph adds reimbursement. That's correct. And that refers to being reimbursed from any recovery of the plan participant. That's correct. I don't know if it makes any difference to our position. The fact is I believe reimbursement is more applicable to this set of facts. The plan calls for either one. It's to be paid or may be paid is the precise language of that provision. And there's another complication in this case with respect to their obligation to pay. And I have to confess it's not been fully briefed, but that involves the Shields case because the policy paid or payable has no application in a situation in which there is a requirement for the insured to reimburse. Now, under Shields, there would in fact be a situation in which they may are or may be required to pay, to pay the insured. Just another complication that exists in this case because Mr. Saylor has suggested that this language precludes, perhaps as you were suggesting, precludes recovery or precludes the interpretation that we're offering of the reimbursement clause because there is nothing that needs to be paid under this provision. But the fact is I believe Shields indicates that once you take away, once you take away this dispute, the debate regarding these two provisions of the ERISA plan, there is or may be an obligation, at least under the precedence of this Court, the obligation to in fact pay. I will, unless there are other questions, I'll take the rest of my time. Thank you. Good morning. May it please the Court. Daniel Saylor appearing on behalf of Citizens. It seems to me that the plaintiff's position in this case is very much the core position, is that there's this problem of conflict that needs, as between the plan's coordination provision and the plan's sub-row reimbursement provision, that needs some novel interpretation to create a harmonious reading of the two. I mean, to me their position is more than that. It's that, look, this is a plausible construction and it's an So we defer to the plan's reading of it. You know, we do it all the time when it's so... There are a couple problems with that. Number one, this was never the plan's reading of it. This is the plaintiff's new argument on appeal. But wait, did the plan take this... It didn't take this position. What the plan contended below was that you've got coordination language, which by itself would seem to make the plan primary over no-fault. But then when you kind of, in this kind of loosey-goosey way, look at the fact that they've got this sub-row provision that mentions no-fault, that somehow overall it evinces this intention that the plan be secondary to no-fault. Well, it's essentially the same argument. Well, it seems to me a little bit different. They're basing that argument on this district court opinion. Boy, the name escapes me. I think, I don't remember if it's even cited in the brief. I don't think they cited it. But the thing is... Edwin Jones... Yeah, that's it. You're right. And that's a different argument that Mr. Gonzato is making here on appeal. He's making a new construction, a new interpretation of the coordination clause that differentiates between primary and no-fault. I understand. It's just a different argument. I mean, in the trial court, I remember he was taking the position that, look, I mean, this is the way we interpret it. This is what we intended. Let's talk about what the two clauses do. And really, I think the position is demonstrably untenable. Subrogation reimbursement, as Your Honor noted, is entirely about a third source of money coming in. It's dependent upon Mr. Hill's rights to recover against somebody else, whether it's U.M. or tort recovery or whatever it might be. Let's take those out for a moment. Let's just say that this is an auto accident with an injury, and you've got no-fault insurance, and you've got the ERISA plan, and there is no other source of money coming in that would bring into play the subrogation reimbursement provision. Simply a priority dispute, very much as in the Citizens v. MidMichigan case, which I know Judge Moore, you dissented on, but there it is. As between when you look at the priority language in the Coordination Clause, entirely consistent with what the Citizens policy says, there really is no question that the plan is primary, and the Citizens coverage is excluded to that extent. Now, how does a subrogation reimbursement provision come into play? Well, actually, in that scenario, as Your Honor noted, it conceivably could. If the no-fault policy was not a coordinated policy, and instead the person had paid full premiums and got full coverage uncoordinated, then if the plan had paid the medical expenses, they could look at the subro language, again, which is entirely dependent on the rights of the plaintiff, of Hill, and say, well, you know what, he has rights to recover PIP benefits from the no-fault insurer. We paid those benefits, we are subrogated to his position, so they can exercise that subro claim and get their money back from Citizens. That is not really coordination of coverage, that is subrogation. And in fact, in this case, Citizens paid U.M. damages, the plan paid medical expenses. It is not a matter of coordination, it is a matter of subrogation, where the plaintiff recovered this other money, and under the plan's language, it is entitled to take reimbursement out of those funds. So, the fact that no-fault insurance is mentioned in the subro language is not a shocking, surprising thing. It doesn't evince any kind of intention that the plan be automatically secondary. It just means, as we said, if there is a right of recovery against the no-fault insurer for PIP benefits, which could be if it was uncoordinated, then it would exercise its rights. But, again, that whole subro language, by its own text and by the very meaning of subrogation, and as Your Honor noted, the reimbursement portion simply is just if the money has already been recovered, then the money obviously comes from the plaintiff as opposed to that other source. It is entirely dependent on the rights of Hill to recover against that other source. And there is something inherently bootstrapping about the plaintiff's position here. If the subro reimbursement provision is supposed to elevate the PIP to primary status, it only does so because of the plan's recovery of the UM money. But by the time we have recovered the UM money by exercising the subrogation clause, the plan is finished. The plan's been reimbursed. The plan's done. Now, the plan could not say, okay, now we have a claim by stepping in Mr. Hill's shoes. Now we can say that PIP is primary and we can be subrogated to that claim to get reimbursed. It can't. It's already been reimbursed. No, but that's presuming that they get the UM money first. I mean, they could go for the PIP money first. But there again, if there's been no recovery from Hill's pocket, there's no basis that Hill could go after citizens to recover PIP money. Hill is looking at Urban Meritor and citizens, and he has no claim against citizens for PIP because PIP is excluded in light of the Urban Meritor coverage. He has no claim, therefore Urban Meritor can't step in his shoes and collect PIP money from citizens. It can only go after the UM money because that's the only money that Hill can claim. And having done that, Urban Meritor is satisfied. There is no more reason to resort to the subrogation. But your hypothetical didn't have UM in it. Well, if you take the UM out of it and you'd simply have the PIP, you simply have one of the two carriers paying the medical expenses, and it would be Urban Meritor because, as I said, under the two provisions. Right, but that begs the question because the question is whether that provision... Which provision? The reimbursement subrogation provision steps in after you've figured out the coordination of benefits and repayments. The question is whether it operates only to say you're segregated to whatever existing rights there is, assuming that we're primary because of the coordination of benefits, or whether it has a separate significance that says, all right, we've already figured out who has to pay. Now we have the right to collect whatever we can from any source. And under that scenario, as you said, if you take the UM out of it and you simply have PIP involved, then Urban Meritor has paid that, and then they say, oh, can we go after somebody for reimbursement under our subrogation provision? And since it's inherently dependent on any rights Hill would have, you have to say, well, what rights would Hill have to go after another source? You mean like PIP against citizens? No. Hill has no rights to get that money from citizens because that coverage is excluded in light of Urban Meritor's admittedly primary coverage. See, you're right. There is kind of a circular thing about it, but that's the defect in the plaintiff's argument. And that's why you can't, it utterly distorts the subrogation reimbursement provision to try and say that it impacts coordination of coverage. It's nothing different. What is the review standard? Do we apply Fido-Stone? Is it arbitrarily propitious to apply to the plan's construction? For the reasons I've argued, I think it's de novo. I think that construing priority of coverage is something different than providing, something different than the court's review of a plan administrator's denial of a claim. Basically, you know, when you're looking at what are our terms of coverage, this type of hospitalization, this type of scenario, do we pay full? Do we pay any of it? That kind of a claim denial decision, assuming they've deserved the right to discretionary review, then it's arbitrary and capricious. But this is something different than that, as I've argued. And again, even separate from that, what is being argued is not what the plan administrator ever argued. And so it's quite different. As I said in the last part of my brief, the sense of unjust result here, if there is that sense, is not because of the coordinated reduced policy nature of the no-fault insurance and, you know, Mr. Hill's reliance instead to just have his medical coverage pay for his losses. The problem here is that the ERISA plan would include a right to take reimbursement out of his tort recovery, even when it's for pain and suffering damages as opposed to economic loss. Under the No-Fault Act, 3109a, policyholders, because it's mandatory coverage, it's expensive coverage, they're allowed to reduce their premiums and, in essence, by and large, waive the medical coverage under No-Fault and instead use the medical coverage that they have through their employment. And Hill did that. Yeah, unfortunately, Mr. Sobel, I mean, I understand that the Michigan Court of Appeals has spoke to a similar situation a while ago, but the plan always was for No-Fault coverage was that whoever you coordinated with, right, always had to act like a No-Fault carrier. I mean, nearly in cases outside that, which meant that they did not have a right to reimbursement. The review was always to leave the insured as if they had, as if everything was under the No-Fault system. Maybe they would get their PIP benefits from a different source, but they had to operate as PIP benefits. And this type of situation was never contemplated by 3109. Now, does that mean that we step in? Obviously not, but that wasn't what 3109A or whatever was intended, right? Well, it just seems to me that for an ERISA plan, obviously we're trying to manage costs as well, for them to have a reimbursement provision when they've paid medical expenses and then the plaintiff, you know, gets a tort recovery. If that tort recovery was full and covered economic and non-economic losses and medical expenses, then that makes sense and sure, why shouldn't the ERISA plan get reimbursed out of that? It doesn't mean that therefore they should look to No-Fault and pocket that kind of money. It just means that that's a fair result. It goes arguably beyond fair when the plan says, you know what, even if you get pain and suffering money, but one could also say that the net effect of that is that the person never got their PIP benefits and so if they didn't really get their PIP benefits, who should be paying? Well, their No-Fault carrier. Well, okay, and of course that's the argument not so much that which between the two is primary and which is secondary under the SHIELDS approach that in essence says that the plan didn't pay anything and therefore the No-Fault insurer, even if they are secondary or excess, they're the only one and therefore they should have to indemnify that and while SHIELDS went one way on that, that's already been litigated in this very dispute and is resolved and so it seems to me that door is closed. They decided not to challenge that in the Supreme Court. They dismissed their appeal. You know, it's not too hard to speculate why, but I think that the terms of the plan, I've argued it pretty much every which way I can in the brief and I probably couldn't articulate it here in a half a minute, so I think that the trial court got it right and this court should affirm. Thank you. Thank you. Thanks. If I can speak to the inequity as I see it in this case because Mr. Saylor has talked to you about the fact that there is no inequity in his view with the fact that Arvin Meritor can make this claim to the uninsured motorist fund that the plaintiff has collected, but what's really inequitable in this situation, it seems to me, is that Mr. Hill had two sources of payment, two sources of payment both designed to cover the very injuries that he had, two sources of payments that he paid for. As Judge Clay noted in the SHIELDS case, he paid for them and yet he has two sources of payment and he ends up paying for his medical bills. That's what's happening in this case and that's what's wrong and that's why it seems to me the language of the reimbursement provision should be enforced. If I understood Mr. Saylor right, he's suggesting that we're saying that they are primary. Again, they are not primary, but they are subject to the reimbursement provision and because they are not primary, they do not have to pay the $440,000 that they would have to pay if they were primary. That is not our position. Our position is simply that, in point of fact, the reimbursement provision has to be applied to this situation. And again, you have to understand, to accept Mr. Saylor's position is to render a portion of the reimbursement provision totally, totally inapplicable. Did Oregon Merritree take this position, offer this construction? No, they did not. Their position was that they were, that Citizens was primary precisely because of this reimbursement provision. Now, that's obviously slightly different than the points that were made in terms of harmonizing these two things. But because there is a specific reference to no-fault benefits in the reimbursement provision and because no-fault benefits are going to be, they must be secondary under this plan because the plan's priority provision describes the number one determination of primary coverage to be, in fact, an employment relationship. So it's clear there is never going to be a situation in which no-fault benefits will, in fact, be primary under this plan. So this plan doesn't cover any relatives or anything? I assume it does, but the point is it's primary that I'm talking about. The fact is it has to be primary, the plan and its coverage. On the other hand, the reimbursement provision specifically states that one of the sources for these reimbursement provisions is, in fact, no-fault benefits. Now, if their interpretation of this provision says that this doesn't apply, any person or entity who is obligated to provide benefits, including no-fault benefits, now, if their position is correct, that clause of the plan can never kick in, ever, because they'll never have to pay benefits, ever. That's their construction. I'm accused of offering a construction which renders certain parts of it to be without effect, but theirs does, too. I want to make sure I understand this. The Oregon Meritor Plan, is that something that only covers employees, or can it also cover employees' families? I'm only assuming that it does, in fact, cover families. Okay, Mr. Siller. It does. Mr. Siller is correct. It does cover families. Yes. Okay. Thank you. Thank you. Thank you very much for the argument and the case to be submitted.